(165 App. Div. 777)

### In re BURLANDO. (No. 4.)

(Supreme Court, Appellate Division, First Department. January 8, 1915.)

ATTORNEY AND CLIENT (§ 53*)—DISBARMENT—EVIDENCE—FRAUD ON CLIENT.

　　In disbarment proceedings, evidence *held* to show that the attorney had participated with his father in swindling a client by securing a loan from her on the security of a mortgage on the father's property, which the attorney did not record as he agreed, whereby subsequent mortgages took precedence of it and the client's security was lost, so that the attorney should be disbarred.

　　[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 74, 75; Dec. Dig. § 53.*]

Proceeding for the disbarment of Robert C. Burlando, an attorney. Respondent disbarred.

See, also, 160 App. Div. 890, 144 N. Y. Supp. 1107.

Argued before INGRAHAM, P. J., and McLAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Isham Henderson, of New York City, for petitioner.
Ernest Hall, of New York City, for respondent.

INGRAHAM, P. J. The Association of the Bar of the City of New York charged the respondent, an attorney of this court, with professional misconduct, in that in July, 1909, the respondent represented to Miss Henrietta Beck that George Zuelch was the owner of certain real property on Barnes avenue, Bronx borough, New York City, "upon which I wished a loan of $1,500," and advised Miss Beck to deliver to the respondent $1,500 to be secured by bond and mortgage on the property; that upon such representation and advise Miss Beck paid respondent $1,500, who subsequently delivered to Miss Beck a bond for $1,500, purporting to be executed by Zuelch, stated to Miss Beck that there was a mortgage also, and stated to her that he, the respondent,

would have the mortgage recorded; that thereafter the respondent represented to Miss Beck that the mortgage had been recorded, and had been returned to the respondent by the register, and was in the respondent's possession; that these representations were false, and were known to be false by the respondent at the time he made them, as no such mortgage was ever recorded; that the property standing in the name of Zuelch was owned by Emanuel Burlando, the father of the respondent, which fact the respondent kept from Miss Beck; that at the time the respondent received Miss Beck's money there were prior existing mortgages aggregating $19,000 against the same property, of whose existence the respondent did not inform Miss Beck; that after receiving Miss Beck's money the respondent caused other mortgages, aggregating $10,000, to be recorded against the same property, of the execution and recording of which the respondent did not inform Miss Beck, nor did he inform these later mortgagees of the loan from Miss Beck; that the respondent did not use the money for the purposes for which it was delivered to him, but he and his father converted it to their own use; that some time after July, 1909, the respondent's father paid Miss Beck $100 as interest, and in January, 1913, the respondent paid her $500 on account of the principal sum, but the balance he has not returned to her, although she has made due demand for it. The respondent having interposed an answer, the proceeding was referred to the official referee.

Upon the hearing before the official referee there was a sharp conflict of evidence between Miss Beck and the respondent as to the making of the loan. She testified that she gave the money to the respondent, and he took it and kept the mortgage, and said he would have it recorded, and there was no one in the room when the money was paid over, except the respondent, Miss Beck, and her mother. This is contradicted by the respondent, his sister, and his father. The respondent had been admitted to practice February 12, 1907, and these transactions occurred in June, 1909, two years afterwards. The respondent had his office with his father at this time, attended to his father's business, and seemed to have had intimate knowledge of his father's business and financial condition.

Counsel for the respondent states in his brief that:

"The crime committed by the elder Burlando in this case is so utterly conscienceless and wicked, and shows such gross depravity, that it is inconceivable that the respondent, a young man of spotless character, could have deliberately conceived it, or had any part in carrying it out, and he certainly received no benefit from it"

—thus trying to shift the responsibility for this fraud on his father. Counsel for the respondent concedes that the respondent has been guilty of gross negligence in not seeing to it that the mortgage was recorded, and concedes that if the mortgage in question had been recorded at about the time it was made, or before the placing of the several permanent loans, or if its existence had been made known before such permanent loans were made, it would have been a first-class security, and would have been paid out of the said loans, and therefore by reason of the failure by respondent to record the mortgage Miss Beck lost her money. He then adds:

"The only question, then, presented is whether the respondent was guilty of gross negligence amounting to crime, or only of such partially excusable negligence as might call for some discipline, but not necessarily for the complete disbarment of the respondent."

The respondent in his answer denies that:

"After receiving Miss Beck's money, or at any other time, he caused other mortgages, aggregating over $10,000, to be recorded against the same property; nor was he aware that such mortgages had been executed or recorded."

Respondent testified that when he was admitted to practice he opened an office in connection with his father, who was a builder and real estate operator. He occupied the same offices with his father, having their desks in the same room. At this time he knew that his father was engaged in building enterprises and held the property upon which he was building in the name of Zuelch. He held daily communications between his father and Zuelch regarding the buildings that were being erected. Respondent had closed loans for Miss Beck in 1908 and 1909, and he applied to Miss Beck for this loan at the request of his father, and when she consented to make the loan he prepared a bond and mortgage and had them executed. When the bond and mortgage were executed, the father took the acknowledgment to them. Then the respondent, having procured this money, either for himself or for his father, refrained from having the mortgage recorded, so that his client had no protection for the loan. Finally, when subsequent loans were made upon the property, the respondent was present. He himself had to do with drawing up other agreements that were subsequently executed, and they were indorsed in the respondent's handwriting. He says that he cannot remember whether he drew up these agreements himself, or whether he just ran them through, as he says, after they were drawn up; that he was present when these other loans were closed; that he was there "simply as a relative of my father and as a companion of my sister"; that all he did was under the instruction of his father; that the mortgages and subrogation agreements concerned the property mortgaged to Miss Beck; that the check that was turned over to the respondent's father was indorsed in the handwriting of the respondent.

It was the placing of these additional mortgages upon the property that made Miss Beck's mortgage valueless and caused her to lose her money. He also as notary public took the acknowledgments of these mortgages that were placed upon the property. He testified on cross-examination that the first time he knew the mortgage was foreclosed was in December, 1911, or January, 1912; that he never knew anything about it; that Miss Beck had never asked him for the mortgage; that he had transacted other matters for Miss Beck; that when he handled other transactions for her he usually sent the papers to her. He denied that he had told her he would have the mortgage recorded, and stated that he had told her he was going out of town, and that his father would record the mortgage, although in his answer he had alleged that he said to Miss Beck there was a mortgage, also, and that he would have the mortgage recorded. He further stated that after his return he asked his father about it, and was told that it was recorded, but took no steps to see that it was recorded.

An examination of this testimony of the respondent, I think, clearly demonstrates that it is false from beginning to end. The attempt to shift the responsibility for his gross neglect of his client's interests on his father, and the attempt of his father to assume responsibility for the swindling of Miss Beck out of her money, is equally unavailing. It is perfectly plain that the young man understood perfectly well that the failure to record that mortgage would enable his father to place other mortgages on the property without paying Miss Beck the money due to her. It is unbelievable, if he intended to have the money repaid to Miss Beck, he would have not had the mortgage recorded and returned to her. It is inconceivable that he could have been present, and have taken part in making and executing other mortgages on the property, and had the checks in his possession to be used in those transactions, and taken the acknowledgments of some of the instruments involved in those transactions, and not have known that the carrying out of those transactions were a swindle on Miss Beck, which resulted in the destruction of her security. He had occupied offices with his father, constantly preparing deeds, leases, mortgages, and other instruments in relation to his father's property. It is absurd to say he was not fully acquainted with his father's transactions and aided him in carrying them out. The father and son and daughter were all engaged in this business. When the father wanted $1,500, he instructed the son to persuade Miss Beck to loan that amount. Of course, both father and son knew, if the mortgage was not recorded, it would enable them to procure other mortgages on the same property, or to convey it without securing to Miss Beck the money due her.

The close and intimate business relations which existed between these three people, the knowledge that they had of general transactions in that office, conclusively showed that this present assumption of ignorance, as to everything which was connected with the swindling of this unfortunate woman, was not the isolated transaction of the father, but was participated in by all three. The testimony of Miss Beck and her mother directly contradicts the testimony of the respondent and his father and his sister. They have no special interest in this proceeding, and on the face of it their testimony is perfectly consistent and according to the probabilities of the case, while the testimony of the respondent, and the father and the sister, is most unreasonable and unnatural. There is no presumption of innocence that can overcome such inherent improbability as is disclosed in this record. The respondent knew that his father was short of money. He knew that at his father's request he had persuaded Miss Beck to make this loan, and he had undertaken for her to see that the mortgage was recorded. He allowed it to remain off the record, and took part in putting other mortgages on the same property, which rendered her mortgage valueless, and he cannot now escape the responsibility for his actions.

I think, therefore, upon this record, the respondent is clearly shown to be a man who never should have been admitted to practice, and who now should no longer be allowed to remain a member of the profession.

He is therefore disbarred. All concur.